IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | |
|---|---|
| DOROTHY MATTHEWS | * |
| Plaintiff, | * |
| vs. | * Case No. 05-0570-WS-C |
| ALASKA SEABOARD PARTNERS LIMITED PARTNERSHIP, et al. | * |
| Defendants. | * |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

COMES NOW Dorothy Matthews, Plaintiff in this action, and in opposition to the Motions for Summary Judgment filed by the Defendants respectfully submits the following:

**NARRATIVE STATEMENT OF FACTS**

This case arises from the institution of foreclosure proceedings against Dorothy Matthews, a 55- year-old widow who lives at 1454 East Barkley Drive, Mobile, Alabama. In March 1994, she and her late husband, Arnold Matthews, obtained a mortgage loan from Defendant Nationscredit Financial Services Corporation of Alabama ("Nationscredit"). This was a 10-year loan in the amount of $21,011.24, payable in 120 monthly installments of $345.66. (See Exhibits 1, 2 and 3). The last payment was to be made on March 29, 2004. Since the beginning of the loan, the Matthews paid a total of $46,371.31 in mortgage payments to Nationscredit and their assigns. Nevertheless, Defendant Alaska Seaboard Partners Limited Partnership ("Alaska"), the last in a series of assignees, instituted foreclosure proceedings in January 2005, claiming that over $16,666 remained owed on this loan. As discussed below, the evidence demonstrates that at the time the foreclosure notice was issued Alaska had absolutely no basis for its determination that Mrs. Matthews owed $16,666 and no way of determining the true amount, if any, owed. The evidence

further shows that Alaska's foreclosing attorney had no evidence verifying this amount due at the time the foreclosure notice was published and to this day has still not provided verification. (See Exhibit 11, p. 43)  This suit was filed in state court to enjoin foreclosure, to seek determination that Mrs. Matthews has satisfied this debt, for an accounting and to recover damages.

**The Mortgage**

The Matthews obtained their mortgage from Nationscredit on March 24, 1994. The principal amount of their loan was $21,011.24. The note called for 120 payments of $345.66 beginning in April 1994 and concluding in March 2004. The annual percentage rate on the loan was 15.163%. The note provides that "if any part of a payment is not made within ten days after its due date, borrowers agree to pay a late charge of 5% of the interest of the payment which is late, or $.50, whichever is great, but not in excess of $100.00." (See Exhibit 1).  The note further states the Matthews agree to pay an interest rate of 8% per year on "any amount which remains unpaid after the final due date on this agreement." (Id.).  Neither the note, the Truth-in-Lending Disclosure, nor the mortgage provide for any penalty, charge or other consequence of a late payment, other than the late fee provision cited above. (See Exhibits 1, 2 and 3). The Matthews' Nationscredit mortgage was recorded on April 27, 1994 and reflects a stated principal amount of $21,011.24. However, the "sum" of the recorded mortgage is $41,479.20, the amount of the total payments of interest and principal due over the course of the loan. (See Exhibit 3).  As stated below, this negates the Defendants' speculation that interest was to accrue on this loan under the simple interest model and, to the contrary, reflects the parties' understanding that the interest was pre-computed.

**Mr. and Mrs. Matthews' Payment History**

Mr. Matthews died on December 25, 2001. Until then, he was the one primarily involved in making the monthly mortgage payments. Many of these payments were made by money order. Others were made out of their joint checking account. However, according to Mrs. Matthews every payment was made. (See Exhibit 6, p. 79-80). She admits that some payments were made late and that some payments were returned NSF. However, Mrs. Matthews states the payments that were

missed and the payments returned were made up with subsequent payments.

> Q Let me ask you this. The terms of the loan required hundred and twenty monthly payment at $345.65, I think it was.
>
> A Yes.
>
> Q Over a ten year period?
>
> A Yes.
>
> Q How many payments did you and your husband make?
>
> A All of them.
>
> Q You made a hundred and twenty payments?
>
> A Yes, all of them.
>
> Q How do you know that?
>
> A Every time that we got behind we always paid it up. As I said before, furthermore, if we had been three or four months behind in a payment we would have been in foreclosure.

(See Exhibit 6, pp. 79-80).  Even when she and her husband were in bankruptcy (between January 1997 and July 1999) the Matthews made all of their payments directly to the mortgage company. (See Exhibit 6, p. 60).

As stated, Defendants have yet to produce any complete payment history. (See Exhibit 11, p. 43; Exhibit 9, pp. 83-84).   Yet even the partial data that has been produced supports Mrs. Matthews' testimony that all payments were paid and that this loan was satisfied prior to the foreclosure notice.  Here is a summary of those payment records:

-Between March 1994 and May 1998 total payments were made in the amount of $18,703.32;[1]

-Between November 1998 and May 1999 total payments were made in the amount of

---

[1] This is evidenced by the Nationscredit payment history produced in discovery and attached as Exhibit 7.  That ledger only covers the period March 1994 through May 1998.

$9,314.54;[2]

-Between June 1999 and March 2004 (the end of the loan term) total payments were made in the amount of $18,353.45.[3] Those records also reflect payments made after the end of the loan term in the amount of $1,383.65;[4]

Taking all the payment history produced by Defendants before and during this lawsuit, a gap in data remains for May 1998 to November 1998. (See Exhibit 9, pp. 83-84). However, even with those missing months, the documents produced by Defendants document a total of $46,371.31 paid between March 1994 and March 2004, with $1,383.65 paid after March 2004.

The only evidence of any payment history during the months May 1998 to November 1998 is Mrs. Matthews' testimony that all payments were made. Therefore, taking the Defendants' own records together with Mrs. Matthews' testimony, the total paid by the Matthews against the loan balance during the term of the loan was $48,099.61.

The various sources of payment information and a discussion of the information available at the time of the foreclosure follows.

**Records Produced Prior to Foreclosure**

In 2003, Mrs. Matthews requested a pay-off history from the loan servicer. She was provided with the ledger attached hereto as Exhibit 4. The transactions reflected in that ledger begin on June 2, 1999 and that entry reflects this is a "new loan" with a principal balance of $20,133.65. Mrs. Matthews was not presented with any information regarding her payment history from March 1994 to June 1999. It was only after the foreclosure proceeding when any data regarding any period prior

---

[2] This is derived from non-ledger "Loan Management" records produced in discovery and attached as Exhibit 27.

[3] This is evidenced by the payment history ledgers maintained by SN Servicing, Alaska's servicer, and produced in discovery (attached as Exhibits 4 and 5). Those ledgers do not include data before June 1999.

[4] Plaintiff recognizes that checks written in June, July and April of 2004 were returned NSF for a total of $1,036.95. However, Alaska's payment ledger does not appear to include those payments and, therefore, the total payments reflected thereon is not effected by those checks.

4

to June 1999 was provided.

**Foreclosure Action**

The foreclosure proceedings began on January 12, 2005 when attorney Chalice Tucker, representing Alaska, sent Mrs. Matthews notice that her home would be sold at foreclosure on February 4, 2005. (See Exhibit 6, p. 31). Notice of the foreclosure was published in the Mobile Press Register. (See Exhibit 11, p. 19). The notice began running on January 14, 2005 (Id., p. 28-29). On January 31, 2005, Mrs. Matthews' son, DeJuan, wrote Larry Vance with National Security and asks for payment history to be faxed. (See Exhibit 12; Exhibit 11, p. 26) That same day Alaska's attorney sent two letters to Mrs. Matthews. One of the letters states the total payoff amount of $16,666 (See Exhibit 13).[5] In that letter, Alaska stated the total unpaid principal due on the loan was $12,606.87. Alaska also claimed an additional $1,805.44 was due in "accrued interest" and a remaining amount in total of $2,253.78 was due for insurance, late charges and fees, In a separate letter, Alaska gives a reinstatement amount of $5,019.88 (See Exhibit 14). (See Exhibit 6, pp. 55-57). Prior to sending out the letter stating the pay-off on the loan as $16,666.09, attorney Tucker had previously requested a pay-off history from her client without success. (See Exhibit 11, pp. 27-28).

When she received the foreclosure notice, Mrs. Matthews, with the help of her son, retained the undersigned attorneys to attempt to stop the foreclosure. Mrs. Matthews could not understand how, after having paid on the mortgage for over ten years, the balance on that ten-year mortgage would be nearly 80% of what the principal balance was to begin with. On February 3, 2005, Richard Fuquay wrote Chalice Tucker requesting the foreclosure be cancelled and challenging Alaska's position that Mrs. Matthews owed $16,666.09 on her mortgage. (See Exhibit 15). When she received the February 3, 2005 letter, Tucker still had not received any pay-off or payment history from her client. In fact, Mr. Fuquay had attached to his letter the partial payment history provided

---

[5]Letter was addressed to Arnold and Dorothy Matthews. Arnold Matthews is Plaintiff's late husband. He died on December 25, 2001.

back in 2003 and that was the first time Tucker had seen that information. (See Exhibit 11, p. 33).

After receipt of the February 3, 2005 letter, Alaska issued a Notice of Continuation of the foreclosure sale rescheduling the sale for March 11, 2005. (See Exhibit 6). In spite of the lack of information available to it, Alaska would only allow Tucker to postpone the foreclosure for one week. (See Exhibit 11, p. 36). On March 11, 2005, Tucker did receive and provided to Mrs. Matthews' attorney some additional payment history information, however, that information was still incomplete. (See Exhibit 7; Exhibit 11, p. 35). On March 11, 2005, Tucker's office postponed the sale again, rescheduling the sale for March 18, 2005. Again, Alaska would not allow any longer extension. (Id., p. 36-38). At that point, Tucker still had not received a full payment history from her client. (Id., p. 38). On March 18, 2005, Tucker's office issued another Notice of Continuation of the foreclosure sale, this time resetting the sale date to April 1, 2005. (See Exhibit 19). Again, no complete payment history had been provided at that time. (See Exhibit 11, p. 38-39). On April 1, 2005, the foreclosure sale was rescheduled again for May 6, 2005. (See Exhibit 20). The foreclosure sale was rescheduled again for June 9, 2005 and was reset again for July 15, 2005. (See Exhibit 21; Exhibit 11, p. 40). On July 15, 2005, Tucker's office issued another continuation notice, this time setting the sale for August 16, 2005. (See Exhibit, pp. 40-41). At this point in time, Tucker's office still had not received a complete payment history from her client. Id. Each time the sale was postponed, a separate notice was published in the newspaper.

On August 31, 2005, Tucker emailed Mr. Fuquay and notified him the foreclosure had been cancelled indefinitely until "we get the payment history resolved." (See Exhibit 23). Tucker sent a confirming letter to the same effect on September 7, 2005. (See Exhibit 24). As of that time, Tucker still had not received a complete payment history on the account nor had she received that information on the day of her deposition (May 31, 2006). This lack of documentation is something that Mrs. Tucker has never seen in her 12 years of conducting foreclosures:

> Q. As of September 7th, 2005, had you been provided with a complete payment history on this account?

A. No.

Q. Have you to this day?

A. No.

Q. Is there any way for you to accurately know what amount, if any, is owed on this account as you sit here today?

A. As I sit here today, no.

Q. Has that ever happened before when you had a dispute where you couldn't get a payment history on an account? A. I don't believe so.[6]

(See Exhibit 11, p. 43)

To this day, Defendants have failed to provide any verification of the $12,606.87 unpaid principal balance upon which the foreclosure was based.  As explained, the information produced by defendants is incomplete and cannot possibly be a basis for verifying that Mrs. Matthews owed any amount on her mortgage, much less a principal balance of $12,606.87.  Moreover, the records produced by Defendants reflect payments made over the course of the loan of $46,371.31.

**The SN Servicing Documents**

The servicing agent for Alaska and its assignors was SN Servicing.  As explained above, Plaintiff was provided a partial "payment history" in 2003 maintained by the servicer which covers the months June 1999 to June 2003. (See Exhibit 4).  Since the filing of this action, Alaska has produced another SN Servicing ledger covering September 1999 to August 2004.  These two taken together show a total of payments made in that period of $19,737.10.  (See Exhibits 4 and 5).

**Nationscredit Documents**

It was not until after the foreclosure proceeding was initiated that Plaintiff was provided any payment history dating back before June 1999.  After the lawsuit was filed, Defendants produced records from Nationscredit which purports to be a payment history for the period of time

---

[6]Chalice Tucker has been representing creditors in foreclosures for 12 years.  (See Exhibit 11, p. 63).

Nationscredit serviced the loan: March 1994 to May 1998. (See Exhibit 7).

The Nationscredit payment ledger shows the amount of each payment transaction, the running current principal balance and the amount of the payment applied to interest and to principal. This payment history shows a total of 52 payments were made over the course of 49 months.[7] Although several of the payments appear to have been made past the due date, the late charge provision provided under the note was invoked on only one occasion.[8] The total amount of payments made within that 49 month period $19,747.27.

**"Loan Management" Records**

The other document produced by Defendants reflecting payments made on this loan the print-out labeled "Loan Management," attached as Exhibit 26. This document covers the period between November 1998 to May 1999. Although the print-out does not indicate how payments were allocated or give a running balance, Alaska's representative confirmed that it reflects payments received. (See Exhibit 9, p. 83). As stated above, those records reflect a total amount of payment during that period of $9,314.54. (See Exhibit 26).

**What the Records Indicate Regarding the Allocation of Payments**

Defendants contend the purported outstanding balance of $16,666 is justified as the result of interest accrued on payments made late. However, this theory cannot be supported by the payment records. For one thing, Defendants have no way of calculating the $16,666 balance because their records, even to this day, leave a six-month gap with no data at all, and a twelve-month gap without any indication of how payments were allocated. Therefore, any position as to how the outstanding balance was derived, or even if there was an outstanding balance at all, is conjecture.

---

[7]This is the "transaction amounts" with a minus sign after those indicating payments made while the figure without the minus sign indicates payment reversals or other charges made against the balance.

[8]Sequence No. 51 shows that a payment of $348 was made on March 26, 1996 and that $316.19 was applied to interest and $31.81 was applied to late charge. No amount of this was charged to principal. Moreover, the $31.81 is substantially more than the 5% late charge penalty provided for under the contract.

Also, there is absolutely no provision in the Mortgage or Note providing for any penalty or other consequence of a late payment other than the assessment of a late fee. (See Exhibits 1, 2 and 3) . Moreover, nothing in the record reflects how interest was to be computed on this loan. In fact, Defendants' own internal records include a "loan set up" sheet where both yes and no were circled next to the line "simple interest code." (See Exhibit 25). Also, the fact that the "sum" of the recorded mortgage is stated as $41,479.20, the amount of the total payments of interest and principal due over the course of the loan, indicates interest on this loan was pre-computed. (See Exhibit 3). At the very least, this conflicting data presents a factual dispute as to how interest was to be computed.

There are other serious questions presented by Defendants' records regarding the allocation of the Matthews' payments. For example, page 4 of the Nationscredit payment history (SN00046) documents payments from April 28, 1995 to February 13, 1996 in the total amount of $3,484.24. (See Exhibit 7).[9] Not a single penny from all those payments was attributed to principal. Although the dates entered on that history indicate some of the payments were made late, no late charge was assessed. None of the witnesses designated to testify on behalf of the Defendants could say why no part of those payments was credited towards Mrs. Matthews principal balance. (See Exhibit 9, p 40; Exhibit 8, pp. 38-39). The next page of that payment history documents $1,716.76 in payments made between February 13, 1996 and March 26, 1996, yet no portion of any of those payments was applied to Mrs. Matthews principal. Again, the Nationscredit representative could not explain this. (See Exhibit 8, p. 39). There is one payment reflected in the Nationscredit history in the amount of $346 where $71.24 is credited against the interest but no amount is allocated toward the principal amount or late charge. The remaining $274.76 of that payment was not credited in anyway towards Mrs. Matthews account - the amount simply vanished into thin air.[10] Again, the Nationscredit

---

[9] Amounts with a dash next to them indicate amounts credited against Mrs. Matthews balance. Amounts without a dash indicate debits against her account. (Exhibit 8, p. 36-37).

[10] See Exhibit 7 - SN00047-Sequence No. 28.

witness had no idea why that would be the case. (Id.). Consider this testimony about the allocation of payments between principal and interest by the witness designated by Nationscredit to testify on these matters:

> Q. Okay. The next page, 47, sequence 28 looks like another 346 payment received. Would you agree with that?
>
> A. That's what it appears to be. Yes.
>
> Q. Okay. And this one confuses me because $71.24 is credited against interest, but then zero against principal. Do you know why that would be?
>
> A. I do not.
>
> Q. I mean, under normal circumstances wouldn't the full amount of the payment be divided between those two columns in whatever proportions?
>
> A. Well, if you look at all of the previous ones that we have discussed, yes, the two amounts add up to the amount received. In this case it doesn't, but I'm not sure why.
>
> Q. Okay. Let me ask you, I mean, you've got a lot of experience in this area. I mean, a payment's received; it's either applied to interest, principal or -- unless there's some charge out there, right, some fee?
>
> A. Again, you know, I can't speak to this. I mean, I see what you're talking about, but, you know, I can't -- I don't know why this is like it is.

(Id., pp. 38-39).

Overall, the Nationscredit payment history ledger shows many other payments being made with no portion of those payments being attributed to pay down Mrs. Matthews principal. (See Exhibit 7). In fact, the Nationscredit payment history covers the period between April 27, 1994 and May 6, 1998 and records receipt of $18,703.32 in total payments. (Id.).[11] Of that total amount paid by Mrs. Matthews, only $672.25 was applied to pay down her principal balance. (Id.)

## LEGAL ARGUMENT

In her complaint Plaintiff states the following causes of action: Wrongful Foreclosure (Count One); Negligence (Count Two); Wantonness (Count Three); Breach of Mortgage and Note (Count IV); Fraud (Count Five); Slander (Count Six); Declaratory Judgment (Count Seven); and Preliminary

---

[11]This number takes into account the amounts that seem to be reversed for whatever reason and this amount represents the net payment received.

and Permanent Injunctive Relief (Count Eight)- including the permanent enjoining of a foreclosure and demand for accounting. Defendant have attacked on summary judgment Counts One through Six. They have not, however, moved for summary judgment on Count Seven which seeks a declaratory judgment, or Count Eight which seeks injunctive relief. Accordingly, regardless of the outcome of this motion this case will proceed to trial on those issues.

Plaintiff has presented substantial evidence in support of Counts One, Two, Three, Four and Six.[12] Accordingly, summary judgment is due to be denied. Each of these accounts is addressed separately below.

## Wrongful Foreclosure

"A mortgagor has a wrongful foreclosure action whenever a mortgagee uses the power of sale given under a mortgage for a purpose other than to secure the debt owed by the mortgagor." Reeves Cedarhurst Development Corp. v. First American Federal Sav., 607 So.2d 180, 182 (Ala.1992). The tort of wrongful foreclosure was appropriately characterized by the Alabama Supreme Court in Johnson v. Shirley, 539 So. 2d 165 (Ala. 1989) as follows:

> Regarding the wrongful foreclosure claim, it is generally recognized under Alabama law that a power of sale given under a mortgage affords the mortgagee an additional and more speedy remedy for recovery of the debt. [citations omitted] However, *the mortgagee cannot use the power of sale for purposes other than to secure the debt owed by the mortgagor.* Any improper use of the power for such purposes as *oppressing the debtor, or serving the purposes of other individuals*, will be considered by the court as a fraud in the exercise of the power.

Id., at 168 (emphasis added).

Under Alabama law "the payment or satisfaction of the real property mortgage debt divests the title passing by the mortgage." Ala. Code § 35-10-26; Cottingham v. Citizens Bank, 859 So.2d 414, 419 (Ala. 2003); Barrentine v. Parker, 181 So. 263, 265 (Ala. 1938); Crabtree v.

---

[12]Plaintiff concedes that summary judgment is proper as to the fraud claim (Count Five).

Price, 102 So. 605, 606 (Ala. 1924).

> The main right of a mortgagee is to collect his debt, and if necessary to subject the land to sale for that purpose. All other rights are subsidiary to that main one; so that when the debt is paid, the mortgagee has no further rights under the mortgage, and his title acquired by it becomes, *ipso facto*, divested out of him . . .likewise, all subsidiary rights.

Barrentine, 181 So. at 265.

Where "there is no debt there is no mortgage," Jarrett v. Hagedorn, 185 So. 401, 402 (1938); and, by necessity, there can be no valid foreclosure. Cottingham, 859 So. 2d at 419. "If the debt secured by the mortgage had been paid in full, the (Bank) would have been divested of their legal rights in the property. . .." Id. A foreclosure after satisfaction of the debt is a valid basis for a wrongful foreclosure action Cooper v.Elba Exchange Bank, 496 So.2d 41 (Ala. 1986).

Cottingham involved a claim that a bank wrongfully foreclosed on the plaintiff's mortgage. The bank produced records purporting to show non-payment and an affidavit by a bank officer stating that the amount owed was properly calculated. The plaintiff pointed to other bank records which indicated that the required payments were made and provided her own supporting testimony stating that she had satisfied the debt. The trial court granted summary judgment for the bank, but the Supreme Court reversed because of the conflicting evidence in the record. "[T]he evidence before us supports an inference that the debt secured by the mortgage. . . was paid in full. Therefore, an issue of material fact exists as to whether the mortgage was satisfied." Id., at 420.

The Defendants here are in a worse position than the bank in Cottingham. Unlike the bank in Cottingham, the Defendants in this case presented no evidence supporting their calculated outstanding balance. This is an impossibility because Alaska's payment records, upon which its foreclosure proceeding was based, are incomplete at best. Moreover, that information is questionable in many aspects and can not be used to explain how payments were allocated. Alaska postulates that the $16,666 figure amount is a function of the simple interest accrued on the loan, but

its own witness concedes that it has incomplete data as to how interest was calculated over the course of the loan. Moreover, there is no provision in the Note or Mortgage evidencing the Matthews' agreement that interest on late payment accrue in the manner theorized by Alaska. Those instruments provided one and only one remedy for the late payments - the 5% late fee. In short, the Defendants' evidence falls well short of proving that Mrs. Matthews owed anything at the time the foreclosure was instituted, much less that she owed $16,666.

On the other hand, Mrs. Matthews testified that all 120 payments were made over the course of the loan. More importantly, the evidence produced by Defendants actually supports this testimony. As stated above, the payment records produced by Defendants, which even in their incomplete state, demonstrate that the Matthews made $46,371.31 in payments between March 1999 and March 2004 - significantly more than the $41,479.20 due over the course of the loan. As in the Cottingham case, this presents sufficient evidence from which the jury could infer that the mortgage was satisfied at the time of the foreclosure action and, therefore, the actions taken toward foreclosure were wrongful.

### **Negligence**

Defendant Alaska seeks summary judgment on Plaintiff's claim for negligence. However, there is substantial evidence to establish a negligence claim and that motion is due to be denied. It is well established under Alabama law that in order for a Plaintiff to avoid summary judgment on a negligence, plaintiff must present substantial evidence that the defendant owed plaintiff a duty; that the duty was breached; and the breach proximately caused damage or injury. *See, e.g.* Crown Invs., Inc. v. Bryant, 638 So. 2d 873 (Ala. 1984).

Defendant's primary attack on the negligence and wantonness claim involves its contention that there was not a sufficient duty owed to the plaintiff to satisfy the first element of a negligence cause of action. A duty of care can arise from a contractual obligation and it can also arise in the absence of a contractual obligation based on "a number of factors including public policy, social considerations, and foreseeability of harm." Armstrong Business Services, Inc. v. AmSouth Bank,

817 So. 2d 665, 679 (Ala. 2001) *citing* Pugh v. Butler Tel. Co., 512 So. 2d 1317, 1319 (Ala. 1987) and Smitherman v. McCafferty, 622 So. 2d 322, 324 (Ala. 1993). "The ultimate test of the existence of a duty to use due care is found in the forseeability that harm may result if care is not exercised." Armstrong Business Services, Inc., at 679.  The relationship between the parties is an additional factor which the Court can consider when determining whether a duty is owed.  Patrick v. Union State Bank, 681 So. 2d 1364, 1368 (Ala. 1996).  The key factor is whether the injury was foreseeable by the defendant. Id at 1368. "Due care is relative always and much depends upon the facts of the particular case." Id.

It is clear that the key factor of foreseeability weighs heavily in favor of the Plaintiff in this case.  Under the term of this loan, Plaintiff submits payments to the creditor and the creditor maintains a system to keep track of these payment and Plaintiff's balance owed.  Additionally, the Defendant, in connection with accounting for the Plaintiff's payments and the status of the account provided to the Plaintiff pay-off letters and ultimately letters threatening foreclosure if certain amounts were not paid.  It is obvious that if the creditor does not properly account for and maintain records of Plaintiff's payments, or calculate the interest accrual methods properly, that harm will occur in that Plaintiff will be subjected to foreclosure proceedings in instances where no money is owed.

The Alabama Supreme Court has found that a bank owed its customers a duty of care based upon its analysis of the traditional negligence principles.  In Patrick v. Union State Bank, the Court determined that the bank owed its putative customer a duty of care in opening a checking account, giving checks to the impostor in connection with that account. 681 So. 2d  at 1371.  In that case, an impostor opened a checking account in the Plaintiff's name utilizing a stolen temporary driver's license.  The impostor then wrote several worthless checks on that account and it resulted in the plaintiff being charged with those worthless checks and warrants being issued for her arrest.  In finding that a duty of care existed on the bank's part, the Court observed that "in general, every person owes every other person a duty imposed by law to be careful not to hurt them." Id. at 1369.

14

It then observed that the essential question is whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. Id. *citing* Smitherman v. McCafferty, 622 So. 2d 322, 324 (Ala. 1993).

One of the factors which the Court relied on was the relationship of the bank to the public. The Court stated that "the nature of the activity of a bank, such as Union State Bank, is such that some duty to the public and the exercise of the bank's business may be justifiably imposed." Id. at 1369. Such a duty should likewise be placed upon mortgage lenders who deal with the public. They take in payments from their customers, keep records of those payment which the mortgage company and the customer both rely upon in their dealings. Moreover, Alabama law has long recognized that actions taken which threaten the security of a person's home place, including the threat of foreclosure, rise to a higher level of concern than those matters effecting other types of property. Union Sec. Life Ins. Co. v. Crocker, 709 So.2d 1118, 1122 (Ala. 1997); Liberty Homes, Inc. v. Epperson, 581 So.2d 449, 454 (Ala. 1991); B& M Homes, Inc. v. Hogan, 376 So.2d 667, 671 (Ala.1979).

A jury could easily conclude that Alaska breached its duty of care to Mrs. Matthews when it undertook foreclosure based on the scant or nonexistent evidence that she owed an outstanding balance. Chalice Tucker testified that for nine months she pled with her client to provide some basis for the determination that Mrs. Matthews owed an outstanding balance on her loan. Tucker stated that, in her twelve years of conducting foreclosures, she has never encountered that situation. We know from the evidence presented not only that there was no complete payment history upon which to calculate the $16,666 amount owed number, but that the evidence available to Alaska demonstrated that the Matthews had paid at a minimum well more than the total amount owed over the course of the loan. Yet Alaska nevertheless directed its attorney to send out a foreclosure notice and letter stating that over 80% of the original principal borrowed remained due. A jury could certainly conclude that Alaska breached its duty and that it was foreseeable that such an unsubstantiated position would cause harm to Mrs. Matthews.

**Wantonness**

Defendant also seeks summary judgment on Plaintiff's wantonness and claims that "Plaintiff cannot maintain her wantonness claims against Alaska, as they are based on the same allegations as those avered in her negligence count." (See Doc. 62, Alaska's Brief and Memorandum of Law in Support of Motion for Summary Judgment). Wantonness however is a distinct cause of action from negligence and has its own test. To be guilty of wanton conduct, defendant must have with reckless indifference to the consequences consciously and intentionally done some wrongful act, remitted some known duty, and the act or omission must have produced injury. Dudley v. Bass Angler Sportsman Soc., 777 So. 2d 135, 139 (Ala. Civ App. 2000) *citing* Smith v. Davis, 599 So.2d 586, 588 (Ala. 1982).

However, the same facts cited above in support of Mrs. Matthews' negligence claim would easily support a jury's finding that Alaska's conduct constitutes wantonness.

**Libel (mistakenly denominated Slander)**

Defendant seeks summary judgment on Count Six of Plaintiffs complaint on two grounds. First Defendant seeks to again hide behind SN Services by claiming that it was SN Services and not Alaska who caused the notice foreclosure to be published on multiple occasions. Second, Defendant asserts that the contents of the notice were not false. Because there is evidence which overcomes both of these arguments Plaintiff's libel/slander claim should survive summary judgment.

Under Alabama law a plaintiff can recover for libel *per se* if she proves that the defendant made a written publication of an untrue statement which exposes plaintiff to public ridicule or contempt. Butler v. Town of Argo, 871 So.2d 1, 17 (Ala. 2003). Libel *per se* presumes damage to the plaintiff's reputation and does not require proof of special damages. Id. As is discussed in more detail above, it was, in fact, Alaska who initiated the foreclosure proceedings and caused the foreclosure notices to be published. The notices themselves establish this along with foreclosure counsel Chalice Tucker's testimony. Contrary to Defendant's representations to the contrary, Tucker was representing Alaska in the foreclosure. As is also discussed above, the evidence presented by

Defendants demonstrates that Plaintiff had in fact paid the total amount due under the mortgage. That evidence certainly presents a genuine dispute of fact as to whether Alaska's publication of default and foreclosure were false.  The jury could conclude that the notices published in the *Mobile Register* were false as they announced to the world that Ms. Mathews had defaulted on her mortgage and her home was going to be sold in a foreclosure sale.   Therefore, summary judgment is due to be denied.

## Breach of Contract

As is described more fully above, under the terms of the promissory note and mortgage, Defendant agreed to accept 120 payments of $345.66 together with late charges as repayment for the loan at issue.  As is described above, Plaintiff has presented sufficient evidence from which the jury could conclude she paid more than the total amount of payments called for under the note and that Defendant instituted foreclosure in breach of the Mortgage and Note.  Accordingly, Defendants Motion for Summary Judgment is due to be denied on the breach of contract claim.

      s/Richard W. Fuquay
RICHARD W. FUQUAY
One of the Attorneys for Plaintiff
P.O. Box 40633
Mobile, AL 36640
(251) 433-7177
(251) 433-7172 (fax)
Email: rfuquay@bntech.net

      s/Kenneth J. Riemer
KENNETH J. RIEMER
P. O. Box 1206
Mobile, AL 36633
(251) 432-9212
(251) 433-7172 (fax)
Email: kjr@alaconsumerlaw.com

**CERTIFICATE OF SERVICE**

    I hereby certify that on July 27, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Michael H. Pinkerton, Jon Howard Patterson, Victor Lee Hayslip, Carroll H. Sullivan, Carter Roberts Hale.

    s/Richard W. Fuquay
RICHARD W. FUQUAY
One of the Attorneys for Plaintiff
P.O. Box 40633
Mobile, AL 36640
(251) 433-7177
(251) 433-7172 (fax)
Email: rfuquay@bntech.net

    s/Kenneth J. Riemer
KENNETH J. RIEMER
P. O. Box 1206
Mobile, AL 36633
(251) 432-9212
(251) 433-7172 (fax)
Email: kjr@alaconsumerlaw.com